Patrick HUGHES and Nafise Nina Hodjat, individually and on behalf of all others similarly situated, Plaintiffs,

v.

THE ESTER C COMPANY, NBTY, Inc., and Naturesmart, LLC, Defendants.

12-CV-0041 (PKC)

United States District Court, E.D. New York.

Signed September 30, 2016

George Volney Granade, II, Kim Richman, Michael Robert Reese, Reese Richman LLP, New York, NY, Alvin C. Paulson, Kevin T. Hoerner, Becker, Paulson, Hoerner & Thompson, P.C., Belleville, IL, Jeffrey A. Leon, Quantum Legal LLC, Zachary A. Jacobs, Complex Litigation Group LLC, Highland Park, IL, Patrick J. Sheehan, Whatley Drake & Kallas LLC, Boston, MA, for Plaintiffs.

Michelle Waller Cohen, Steven Alan Zalesin, Jackson Taylor Kirklin, Jonah Moses Knobler, Patterson Belknap Webb & Tyler, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

Plaintiffs Patrick Hughes and Nafise Nina Hodjat (together, "Plaintiffs") bring this putative class action against Defendants The Ester C Company, NBTY, Inc., and Naturesmart LLC (collectively, "Defendants"), alleging that Defendants' labeling of its "Ester-C" vitamin C supplements (the "Products") as "The Better Vitamin C" is unlawful, deceptive, and misbranded. Before the Court are Plaintiffs' motion to certify a nationwide class, as well as California and Missouri subclasses, and Defendants' motion to strike Plaintiffs' damages expert. For the reasons set forth below, the Court DENIES both parties' motions, with the result that the proposed class and subclasses will not be certified.

**BACKGROUND**

**I. FACTUAL BACKGROUND** [1]

The crux of Plaintiffs' claims in this action is that by labeling its product "The Better Vitamin C," Defendants were "able [to] deceive consumers to choose its product over vitamin C (and other competitor's products) and pay more money for its Ester-C Product [ (the "Products") ]." (Dkt. 95 at ECF 8.)[2] Plaintiffs contend that this representation is false, asserting that "an independent scientific study" comparing the Ester-C to "regular vitamin C" found that Ester-C "was not more bioavailable than simple ascorbic acid." (*Id.* at ECF 9.)

Plaintiffs Hughes and Hodjat seek to represent a nationwide class of "[a]ll United

1. The Court presumes the parties' familiarity with the factual allegations in the Amended Complaint, which are also detailed in the Honorable Joseph F. Bianco's prior Order denying Defendants' motion to dismiss. The Court only summarizes those facts relevant to the instant motion.

2. Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the documents internal pagination. The Court notes that the case docket contains many sealed documents, including, but not limited to, Plaintiffs' Memorandum of Law in Support of its Motion for Class Certification (Dkt. 95). To the

extent the Court cites or quotes a document that was previously sealed, the Court has reviewed the document and determined that the cited or quoted section does not merit sealing. In an abundance of caution, however, this Memorandum & Order (the "Decision") will be filed on a restricted basis to allow the parties fourteen (14) days to object to any portion of the Decision that contains information that should remain restricted, *i.e.*, redacted. If no such objections are timely filed, the Decision will be made public in its entirety.

States residents who purchased Defendants' Ester-C Products at any time from January 5, 2006, to the present in the United States." (Dkt. 95 at ECF 10.) On behalf of that class, they have asserted common law claims for negligent misrepresentation and unjust enrichment. (Dkt. 13 at ECF 20-22.)[3] Plaintiff Hodjat seeks to represent a California sub-class class of individuals defined as "[a]ll California residents who purchased Defendants' Ester-C Products at any time from January 5, 2008, to the present." (Dkt. 95 at ECF 10.) On behalf of the purported California class, Hodjat alleges claims under the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CLRA"), California's False Advertising Law ("FAL"), California Business and Professions Code § 17500, *et seq.*, and California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, *et seq.* (Dkt. 13 at ECF 16-17.) Plaintiff Hughes seeks to represent a Missouri sub-class of individuals defined as "[a]ll consumers who purchased Defendants' Ester-C Products in the State of Missouri between January 5, 2007, and the present. (Dkt. 95 at ECF 10.) On behalf of the purported Missouri class, Hughes alleges claims under Missouri's Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010. (Dkt. 13 at ECF 13.)[4] Lastly, Plaintiffs request that the Court appoint the named plaintiffs as class representatives, and the law firms of Reese Richman LLP and Whatley Kallas LLP as co-lead class counsel. (Dkt. 95 at ECF 24.)

## II. PROCEDURAL HISTORY

Plaintiffs filed their original Complaint on January 4, 2012. (Dkt. 1.) On May 15, 2012, Plaintiffs filed their First Amended Complaint, adding, *inter alia*, an additional plaintiff and statutory claims under Missouri law. On June 13, 2012, Defendants moved to dismiss on three different grounds, arguing that: (1) Plaintiffs' claims that the represen-

tations on the Ester-C packaging were false were conclusory; (2) Plaintiffs' claims were not pled with the particularity required under Rule 9(b); and (3) Plaintiffs' State law claims failed because they did not plead adequately the required elements. (Dkts. 16, 17.) On March 15, 2013, Judge Bianco denied Defendants' motion to dismiss. (Dkt. 27.)

After discovery, on March 13, 2014, Defendants filed a letter requesting a pre-motion conference to discuss their anticipated motion for partial summary judgment. (Dkt. 53.) At the conference, the Court granted Defendants leave to file a summary judgment motion solely on the issue of preemption. (5/5/2014 Minute Entry.) On March 27, 2015, the Court denied Defendants' motion for summary judgment, specifically finding that Plaintiffs' claims that Defendants falsely or misleadingly marketed Ester-C products are not preempted by federal statutory or regulatory law. (Dkt. 91.)

On August 4, 2014, Plaintiffs served on Defendants their motion for class certification. (Dkt. 76.) Defendants served their opposition on October 22, 2014. (Dkt. 78.) Plaintiffs served their reply on December 17, 2014. (Dkt. 86.) On July 14, 2015, the Court heard oral argument on Plaintiffs' motion for class certification. (7/14/2015 Minute Entry.) The Court reserved its decision pending supplemental briefing by the parties on (1) whether there exist material differences between Plaintiffs' New York common law claims and the applicable common laws of the other forty-nine States, and (2) Plaintiffs' proposed model for measuring damages on a classwide basis pursuant to the Supreme Court's ruling in *Comcast v. Behrend. (Id.)* The parties subsequently filed supplemental briefing and also briefed Defendants' motion to strike, which was filed on February 16, 2016. (Dkt. 110.) On September 20, 2016, the Court held a *Daubert* hearing, at which Plaintiffs' proposed damages expert testified,

---

**3.** On September 20, 2016, Plaintiffs withdrew their claim for common law fraud for purposes of class certification. (Dkt. 139 ("we hereby withdraw our common law fraud claim for class certification consideration.").)

**4.** Excluded from all classes are: (1) officers and directors of Defendants, their immediate family members, their legal representatives, heirs, successors or assigns, and any entity in which these officers and directors have or have had a controlling interest; (2) governmental entities; and (3) the judges to whom this case is assigned and their immediate family members. (Dkt. 95 at ECF 10.)

and the Court heard oral argument on whether Plaintiffs' expert had proffered a reliable methodology for measuring class-wide damages in this case.[5]

## DISCUSSION

### DEFENDANTS' MOTION TO STRIKE

Defendants have moved to strike the testimony and declarations of Plaintiffs' proposed damages expert, Colin B. Weir, on the grounds that his testimony is unreliable under Federal Rule of Evidence 702 ("FRE 702") and *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the reasons that follow, Defendants' motion is denied.

### I. Applicability of *Daubert* to Class Certification

"Neither the Supreme Court nor the Second Circuit has definitively decided whether the *Daubert* standard governs the admissibility of expert evidence submitted at the class certification stage." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F.Supp.3d 110, 114 (S.D.N.Y. 2015).[6] Other Circuits, however, have applied *Daubert* at this stage of the proceedings. *See, e.g., In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) ("We join certain of our sister courts to hold that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*."); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) ("In its analysis

of [the defendant's] motions to strike, the district court correctly applied the evidentiary standard set forth in *Daubert*[.]"); *Sher v. Raytheon Co.*, 419 Fed.Appx. 887, 891 (11th Cir. 2011) ("[A] district court must make the necessary factual and legal inquiries and decide all relevant contested issues prior to certification.").[7] This approach has been followed by courts within the Second Circuit. *Chen-Oster*, 114 F.Supp.3d at 115; *Ge Dandong v. Pinnacle Performance Ltd.*, 10 CIV. 8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013).

▮ Following this authority, the Court finds it is proper to apply the *Daubert* standard at the class certification stage. But, "the scope of the *Daubert* analysis is cabined by its purpose" and "the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Chen-Oster*, 114 F.Supp.3d at 115 (citation and quotation marks omitted); *see also Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016) ("Despite the lack of a clear legal standard on [whether *Daubert* applies at the class certification stage], trial courts in this circuit often subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to the Rule 23 class certification analysis."); *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 126 (S.D.N.Y. 2014) ("When a motion to exclude expert testimony is made at the class certification stage, the *Daubert* standard applies, but the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." (citation and quotation marks omitted)).

**5.** In addition to the voluminous briefing described above, the parties have submitted countless notices of supplemental authority and respective responses, which the Court has considered. (*See, e.g.,* Dkts. 87, 88, 90, 92, 93, 102, 130, 135, 136, 140, 141.)

**6.** Although the Supreme Court has not decided this issue, it provided guidance in the seminal case of *Wal-Mart Stores, Inc. v. Dukes*: "[T]he district court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so[.]" 564 U.S. 338, 354, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (citation omitted); *see also Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 64

(E.D.N.Y. 2012) ("[R]ecent dictum by the Supreme Court concerning the standards for evaluating expert opinions on a class certification motion further suggests that evidence offered in connection with such a motion must satisfy admissibility requirements." (citing *Wal-Mart*, 564 U.S. at 354, 131 S.Ct. 2541)).

**7.** *See also Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) ("We hold that when an expert's report or testimony is critical to class certification, as it is here ... a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." (citation omitted)).

## II. FRE 702 AND *DAUBERT* LEGAL STANDARD

█ When examining the admissibility of expert testimony, the Court is the "ultimate gatekeeper," and must determine, within its sound discretion, whether the "proponent of expert testimony" has met the "burden of establishing by a preponderance of the evidence" that the expert's testimony satisfies the admissibility standard under FRE 702. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citations and quotation marks omitted). To that end, the Court is "responsible for 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Scott*, 315 F.R.D. at 42 (quoting *Daubert*, 508 U.S. at 597, 113 S.Ct. 2252)). FRE Rule 702 permits expert testimony where:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

█ The Court must conduct a "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "Deference to experts is particularly appropriate when expert testimony concerns soft sciences like economics. Because these disciplines require the use of professional judgment, expert testimony is less likely to be excluded because challenges may ultimately be viewed as matters in which reasonable experts may differ." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 06–MD–1175, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014) (citation and quotation marks omitted), *report and recommendation adopted*, 06–MD–1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015). "The ultimate determination the Court must make on a *Daubert* motion is that the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Fort Worth*, 301 F.R.D. at 127.

## III. ADMISSIBILITY OF WEIR'S REPORT

Defendants attack Weir's report on two grounds: (1) he lacks sufficient qualifications and (2) his methodologies are not based on reliable foundations. The Court addresses each in turn.

### A. Weir's Qualifications

█ Generally, the "first question" in a *Daubert* inquiry "is whether the expert has sufficient qualifications to testify." *Davis v. Carroll*, 937 F.Supp.2d 390, 412 (S.D.N.Y. 2013) (citation and quotation marks omitted). Weir is currently a Vice President at Economics and Technology, Inc. ("ETI"), "a research and consulting firm specializing in economics, statistics, regulation[,] and public policy." (Dkt. 109–1 at ECF 5, 29.) He received a B.A. degree in business economics from The College of Wooster in 2003 and an M.B.A. degree from Northeastern University in 2009. (*Id.* at ECF 29, 139.) Prior to working at ETI, Weir worked at Stop and Shop Supermarkets as cash department head, grocery/receiving clerk, and price-file maintenance head. (*Id.* at ECF 29.)

Weir's current "work involves econometric and statistical analysis, multiple regression, surveys, statistical sampling, micro- and macroeconomic modeling, accounting and other economic analysis." (*Id.*) He has testified in over fifty different court or court-like proceedings and has contributed to many publications. (*Id.* at ECF 31-36.) He has also consulted on a variety of consumer and wholesale products cases, calculating damages relating to food products, household appliances, herbal remedies, health/beauty care products, electronics, and computers. (*Id.* at ECF 5.) He was retained in this case "to determine whether it would be possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of damages suffered by, and/or restitution owed to, the

proposed class of plaintiffs as a result of the allegedly false and misleading" representation on the Ester-C products. (*Id.* at ECF 6.)

Defendants describe Weir's credentials as "shaky," and strongly contest his qualifications to serve as a damages expert in this case:

> At the tender age of 35, Mr. Weir deems himself an "expert" in *all* of the following fields: statistical analysis, regression analysis, conjoint analysis, contingent valuation, business economics, business accounting, survey research, consumer behavior, consumer marketing, and some areas of business finance. He proclaims his expertise in all of these subjects even though he possesses no graduate degree in economics or statistics; has never held any employment in the field of economics or statistics besides his present job as a paid litigation consultant; has never written or co-authored a peer-reviewed article; has never taught an academic course (other than leading a discussion on one occasion as an undergraduate); and could not think of a single instance where he has "conducted and completed a conjoint analysis which has been accepted and relied upon by a [c]ourt."

(Dkt. 111 at ECF 7 (citations omitted).)[8]

■ Under Rule 702, an expert can be qualified "by knowledge, skill, experience, training, or education." In determining whether an expert is qualified, "[a] court should look at the totality of the witness'[s] qualifications in making this assessment." *Humphrey v. Diamant Boart, Inc.*, 556

F.Supp.2d 167, 174 (E.D.N.Y. 2008). Despite Defendants' attempt to paint Weir as wholly unqualified, the Court finds that, looking at the "totality" of his qualifications, Weir possesses the minimum qualifications necessary to testify as to Plaintiffs' ability to demonstrate class-wide damages at the class certification stage.

For example, while receiving his M.B.A., Weir took classes in accounting, finance, consumer survey research, marketing, consumer behavior, product innovation, and conjoint analysis, one of the methodologies he proposes here. (Dkt. 109–1 at ECF 212.) Moreover, the fact that other courts have found Weir qualified is persuasive. *See, e.g., Dei Rossi v. Whirlpool Corp.*, 2:12–CV–00125, 2015 WL 1932484, at *1 n.1 (E.D. Cal. Apr. 28, 2015) ("The Court has reviewed Weir's credentials and finds that he is qualified as an expert."); *In re ConAgra Foods, Inc.* ("*ConAgra*"), 302 F.R.D. 537, 551 (C.D. Cal. 2014) ("The court concludes that Weir's academic training and practical experience qualify him to testify to the calculation of damages using hedonic regression and conjoint analysis.").[9] Thus, the Court declines to strike Weir's testimony on the grounds that he is not qualified to provide testimony on a common methodology of proving damages in this action.[10]

## B. Reliable Foundation

■ Once a court determines that a proffered expert has sufficient qualifications, "the next question is whether the proffered testimony has a sufficiently reliable foundation." *Fort Worth*, 301 F.R.D. at 127 (citation

---

8. Defendants made this argument further at the Court's *Daubert* hearing, pointing out Weir's age and the short amount of time that has passed since he received his professional degree. While these facts do not necessarily render Weir unqualified for the purpose of *Daubert*, they do raise some questions as to the reliability of Weir's testimony.

9. At oral argument, Plaintiffs' counsel, through its questioning of Weir, implied that Weir's testimony had never been excluded by a court. The misleading nature of this suggestion is troubling to the Court. Indeed, in *ConAgra*, while the district court found Weir *qualified* to testify, it nonetheless struck his testimony on class-wide damages, finding that Weir had failed to "identify any variables he intend[ed] to build into the models"

or "identify any data presently in his possession to which the models [could] be applied" and thus left the court with "no damages model at all." 302 F.R.D. at 552.

10. *Zaremba v. General Motors* does not support Defendants' position. In *Zaremba*, the Second Circuit opined that an individual with only a bachelor's degree in engineering and practical experience in designing parts for air bags was not qualified to offer an opinion on an alternative safer design for an automobile. 360 F.3d 355, 359–60 (2d Cir. 2004). Weir, by contrast, has a graduate degree including relevant coursework and practice experience in developing methodologies to prove class-wide damages in consumer fraud cases, such as this one.

and quotation marks omitted). To analyze whether the testimony is reliable, courts consider the following factors:

> (1) whether a theory or technique can be (and has been tested), (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Amorgianos*, 303 F.3d at 266 (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786) (quotation marks omitted).

Defendants attack the reliability of Weir's report on multiple grounds, but their principal objection appears to be that Weir's methodologies cannot be used in this case to calculate class-wide damages. (Dkt. 116 at ECF 7-9.) Because the issue of whether Weir has put forward a workable methodology to assess damages on a class-wide basis is so closely intertwined with the Rule 23(b) predominance analysis, the Court declines to address the reliability of Weir's methodologies in the context of a *Daubert* motion, and instead accepts Weir's expert report and testimony for the limited purpose of deciding the predominance issue. *See Fort Worth*, 301 F.R.D. at 130 (whether damages can be assessed "on a class[-]wide basis [is a] question that is properly considered as part of the Rule 23(b) issue of whether questions common to the class predominate over individuals issues, not to the validity of [the expert's] methods as a matter of admissibility of his expert testimony under the Federal Rules of Evidence."); *see also Ge Dandong*, 2013 WL 5658790, at *15 ("Ultimately, Defendants' objections ... go more to weight than to admissibility.").

Accordingly, Defendants' motion to strike is denied, and Weir's report and testimony are admitted for the narrow purpose of determining whether Plaintiffs have met their class certification burden under Rule 23.

## PLAINTIFFS' CLASS CERTIFICATION MOTION

██ Federal Rule of Civil Procedure 23 governs class certification. A party seeking class certification must first meet the requirements of Rule 23(a), namely that: "(1) the class is so numerous that joinder of all members is impracticable [ (numerosity) ]; (2) there are questions of law or fact common to the class [ (commonality) ]; (3) the claims or defenses of the representative parties are typical of the class [ (typicality) ]; and (4) the representative parties will fairly and adequately protect the interests of the class [ (adequacy of representation) ]." Fed. R. Civ. P. 23(a); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014). With respect to the Court's Rule 23 analysis, "[t]he Second Circuit has also recognized the 'implied requirement of ascertainability.' " *In re Avon Anti–Aging Skincare Creams & Products Mktg. & Sales Practices Litig.*, 13–CV–150, 2015 WL 5730022, at *2 (S.D.N.Y. Sept. 30, 2015) (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30 (2d Cir. 2006)). "To be ascertainable, the class must be readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling." *Weiner v. Snapple Beverage Corp.*, 07 CIV. 8742, 2010 WL 3119452, at *12 (S.D.N.Y. Aug. 5, 2010) (citation and quotation marks omitted).

Upon a finding that the proposed class meets the requirements of Rule 23(a), the Court then determines whether certification is appropriate under Rule 23(b). *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Here, Plaintiffs seek certification of both a Rule 23(b)(2) injunctive class and a Rule 23(b)(3) damages class. Rule 23(b)(2) permits an injunctive class where plaintiffs have demonstrated that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). A party seeking certification of a Rule 23(b)(3) class, must separately meet the Rule's requirements that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

 "The burden of proving compliance with all of the requirements of Rule 23 rests with the party moving for certification" and the party meets it burden by establishing Rule 23's requirements by a preponderance of the evidence. *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) (citations omitted). On a motion for class certification, "it may be necessary for the court to probe behind the pleadings," and "certification is proper only if the trial court is satisfied, after a *rigorous* analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast Corp. v. Behrend,* —— U.S. ——, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (citations and quotation marks omitted) (emphasis added). Merits questions are to be considered "to the extent—but only to the extent—that they are relevant" to the Rule 23 inquiry. *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,* —— U.S. ——, 133 S.Ct. 1184, 1195, 185 L.Ed.2d 308 (2013).

## IV. RULE 23(a) REQUIREMENTS

### A. Rule 23(a)(1): Numerosity

 The first Rule 23(a) requirement for class certification is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In determining whether plaintiffs have satisfied Rule 23's numerosity requirement, courts conduct a "case-by-case analysis of the facts[.]" *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 99 (E.D.N.Y. 2012). Within the Second Circuit, "numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Gortat v. Capala Bros.*, 949 F.Supp.2d 374, 383 (E.D.N.Y. 2013). Here, the putative classes and sub-classes "consist of thousands of individuals," (Dkt. 95 at ECF 14), and Defendants do not contest that this representation is sufficient for purposes of Rule 23(a).[11] Accordingly, Plaintiffs have demonstrated that joinder would be

impracticable and that the proposed class meets the numerosity requirement of Rule 23(a).

### B. Rule 23(a)(2): Commonality

 The second Rule 23(a) requirement for class certification is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs must establish that class members have "suffered the same injury" and that their claims "depend upon a common contention . . . of such a nature that it is capable of class[-]wide resolution." *Sykes v. Mel S. Harris and Associates LLC,* 780 F.3d 70, 80 (2d Cir.2015) (citation and quotation marks omitted). "What matters to class certification . . . is not the raising of common questions . . . but, rather the capacity of a class[-]wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal–Mart*, 131 S.Ct. at 2551 (citation and quotation marks omitted) (emphasis in original); *see also Ackerman v. Coca–Cola Co.*, 09 CV 395, 2013 WL 7044866, at *8 (E.D.N.Y. July 18, 2013) ("In other words, the class members' claims need not be identical, but [P]laintiffs must identify some unifying thread among the members' claims that warrants class treatment."). As one court succinctly put it: "for purposes of Rule 23(a)(2), a perfect identity of facts and law is not required; *relatively minimal commonality* will do." *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) (citation and quotation marks omitted) (emphasis added). "Thus, a court may certify a class even though there will, at some point, be issues that must be determined individually." *Ackerman*, 2013 WL 7044866, at *8.

 Here, Plaintiffs have established commonality. For purposes of this requirement, *Ackerman v. Coca–Cola Company* is on point. There, plaintiffs established Rule 23(a) commonality where there were questions of law and fact common to a class of purchasers of a beverage marketed as "vitaminwater" because "any putative class mem-

---

11. It is true that the exact amount of class members is currently unknown, but "general knowledge and common sense," which can be used at the class certification stage, "indicate that it is

large." *Charlebois v. Angels Baseball, LP*, 10–CV–0853, 2011 WL 2610122, at *4 (C.D. Cal. June 30, 2011) (citations and quotation marks omitted).

ber in [that] case would have the same, central claim: that the name 'vitaminwater' was misleading and deceptive." *Id.* at \*1, \*10. The Court elaborated: "For purposes of class certification, plaintiffs are not required to demonstrate that all of the putative class members had identical motivations for purchasing vitaminwater." *Id.* at \*10. In other words, "whether or not the product name was misleading or deceptive to a reasonable consumer is a single question of fact that satisfies the commonality element." *Id.*

Plaintiffs' proposed common questions are materially similar—indeed, almost identical—to the questions proposed by the *Ackerman* plaintiffs:

- Whether Defendants marketed, advertised, labeled, and sold Ester-C using false, misleading, and/or deceptive statements;

- Whether Defendants omitted and/or misrepresented material facts in connection with the marketing, advertising, labeling, and sale of Ester-C;

- Whether Defendants' marketing, advertising, labeling, and selling of Ester-C constitutes an unfair, unlawful, or fraudulent business practice;

- Whether Defendants' marketing, advertising, labeling, and selling of Ester-C constitutes a deceptive business practice; and

- Whether Defendants' marketing, advertising, and labeling of Ester-C constitutes false advertising.

(Dkt. 95 at ECF 15.) Here, as in *Ackerman*, whether or not a reasonable consumer was misled by Defendants' "The Better Vitamin

C" representation, presents a single "unifying thread among the members' claim." *Ackerman*, 2013 WL 7044866, at \*8; *see also Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 62–63 (E.D.N.Y. 2015) (finding commonality where plaintiffs alleged a price premium injury stemming from the labeling of wipes as "flushable"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) ("A common question . . . is whether the 50% thicker claim is false and/or misleading. The answer to this question is common to all class members, and is apt to drive the resolution of this litigation."); *Ebin*, 297 F.R.D. at 565 ("The common questions in this case are whether the pomace packed into Capatriti tins was '100% Pure Olive Oil,' whether Gourmet Factory negligently misrepresented that Capatriti was '100% Pure Olive Oil,' and whether Gourmet Factory defrauded purchasers by labeling Capatriti as '100% Pure Olive Oil.' ").

Defendants' arguments to the contrary are not sufficiently persuasive.[12] First, Defendants argue that "The Better Vitamin C" lacks an objective meaning and thus there are not common questions to the class. However, for the purpose of Rule 23(a)'s commonality requirement, it is not necessary at this stage to demonstrate that the allegedly false and misleading representation carries a uniform definition, or that all potential class members were, in fact, misled by the representation.[13] *See Belfiore*, 311 F.R.D. at 62 (commonality despite "differing individual circumstances of class members" because "[l]iability under [New York's consumer protection state] does not depend on whether . . . the product met [the consumers'] personal, subjective expectations" (citation and quotation marks omitted)). Rather, as previously

---

**12.** Logically, Defendants make many arguments against commonality that are also applicable to Rule 23(b)(3)'s predominance requirement. To the extent the Court does not address these arguments in this section, it discusses them below in the context of Rule 23(b)(3)'s predominance requirement.

**13.** The Court finds the Second Circuit's decision in *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144 (2d Cir. 2007) relevant, but not with respect to Rule 23(a)'s commonality requirement, as Defendants assert. In *Time Warner*, the Second Circuit recognized that "a general claim of superiority over comparable products" amounts to nothing more than "puffery." *Id.* at

160 (citation and quotation marks omitted). As discussed further below, this issue becomes relevant as to Plaintiffs' ability to demonstrate damages measurable on a class-wide basis, but does not defeat class certification on the basis of Rule 23(a)'s commonality requirement. The argument that "The Better Vitamin C" is puffery that is too vague to be susceptible to a single interpretation also goes to the merits of Plaintiffs' claims, *i.e.*, Plaintiffs could never prove that a reasonable consumer would be misled by something that has no specific meaning, which is an issue that could be addressed by summary judgment once a class is certified.

discussed, the common thread here is the question of whether a *reasonable* consumer was misled by the claim of "The Better Vitamin C." *See Ackerman*, 2013 WL 7044866, at *10.[14]

Second, the lack of uniform labeling also does not defeat commonality. Here, there are differences in the labels across varieties of the Products throughout the putative class period. These variations, however, are not so significant as to prevent Plaintiffs from establishing commonality.[15] A similar argument was rejected by the Court in *Ackerman*. There, the Court found that plaintiffs satisfied Rule 23's commonality requirement despite the defendants' contention "that the alleged misrepresentations were not uniform, but rather varied across product lines, by medium, and over time." 2013 WL 7044866, at *9. The alleged misrepresentations in *Ackerman* were even less uniform than the representations here. In contrast to *Ackerman*, Defendants here concede "that the 'Better' slogan … appeared on all of NBTY's Ester-C products." (Dkt 82 at ECF 21.)[16]

Accordingly, Plaintiffs have satisfied Rule 23(a)'s commonality requirement.

## C. Rule 23(a)(3): Typicality

 The third Rule 23(a) requirement for class certification is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This " 'requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.' " *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 164 (S.D.N.Y. 2014) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)). "Rule 23(a)(3) requires only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Scotts*, 304 F.R.D. at 406 (citation and quotation marks omitted). Typicality is "not highly demanding." *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002) (citation and quotation marks omitted).

 Here, Plaintiffs assert that they "allege a common pattern of wrongdoing—Defendants' deceptive labeling and marketing of Ester-C—and will present the same evidence (based on the same legal theories) to support both their claims and the claims of the members of the Classes." (Dkt. 95 at ECF 16.) This is sufficient to establish typicality. *Belfiore*, 311 F.R.D. at 64 (typicality established where named-plaintiff purchased product at a

**14.** Although the Court finds commonality because of this "reasonable" consumer standard, it agrees with Defendants that the notion of finding commonality based on a claim of being "better"—which cannot possibly mean the same thing to every consumer and is, therefore, not susceptible to a single determination of falsity—is counter-intuitive and seems wrong. However, in addition to the case law that uniformly applies a "reasonable" consumer approach, one rationale for not analyzing the "commonality" of the meaning of the claim itself at this step of the certification analysis is that this issue is addressed in other parts of the certification analysis and in the merits of the false labeling claim overall. Indeed, as discussed *supra* and *infra*, the questions of whether the "better" claim can have a single meaning, constitutes puffery, or is otherwise too vague to be actionable are arguably more appropriately dealt with in the predominance portion of the certification analysis or in a summary judgment motion on the merits of the fraud or negligent misrepresentation claim. That being said, the Court observes that the cases applying the "reasonable" consumer approach mostly involved labeling claims that were con-

crete and would have a common meaning to any, *i.e.*, the "reasonable," consumer, *e.g.*, "50% thicker," "100% Pure Olive Oil," and "flushable." Thus, it is foreseeable that, in the future, courts will distinguish these cases in situations such as this, where the labeling claim is not susceptible to a common meaning, if for no other reason than to promote the efficient resolution of class actions that ultimately will be dismissed on the merits. But this Court is not prepared to go there yet.

**15.** Again, as discussed below, the variations in the Products' labels is relevant as to Plaintiffs' ability to demonstrate damages measurable on a class-wide basis—not commonality.

**16.** Defendants' reliance on *Jones v. ConAgra* is misplaced. Although the Court in that case found a "lack of cohesion" where consumers "were exposed" to different labels, it did so in the context of the predominance analysis, emphasizing that the defendants had not contested commonality. *Jones v. ConAgra Foods, Inc. ("Jones")*, C 12–01633, 2014 WL 2702726, at *5 (N.D. Cal. June 13, 2014).

higher price because he, like the class he sought to represent, relied on representation that toilet wipes were "flushable"); *Ebin*, 297 F.R.D. at 565–56 (typicality where "the lead plaintiffs' and other class members' claims arise out of the same course of conduct by the defendant and are based on the same legal theories."); *Ackerman*, 2013 WL 7044866, at *11 (typicality satisfied where named plaintiffs' and proposed classes' claim involved same issue).

 Defendants counter that the named Plaintiffs' deposition testimony demonstrates that they did not rely on the Products' representations and therefore their claims are not typical. This argument is unavailing, at least at this stage of the litigation. "[I]t has been noted that the unique defenses rule is not rigidly applied in [the Second Circuit] and that a representative may satisfy the typicality requirement and later be barred from recovery based on unique defenses." *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 63 (S.D.N.Y. 2006). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 937 (2d Cir. 1993); *see also Ebin*, 297 F.R.D. at 566 (typicality demonstrated notwithstanding the fact that different variations of the product contained different ingredients and the named plaintiffs might have purchased the variation that did not contain the ingredient, which allegedly made the product's representation false); *In re ConAgra Foods, Inc.* ("*ConAgra Foods*"), 90 F.Supp.3d 919, 974–75 (C.D. Cal. 2015) (finding irrelevant that some class members might not have relied on the products' representations for the purpose of analyzing typicality).

Accordingly, Plaintiffs have established Rule 23(a)'s typicality requirement.

**17.** The Court declines to credit or consider Defendants' accusation that Hughes "bought Ester-C so that Kreisler could continue his litigation campaign against NBTY." (Dkt. 82 at ECF 29.) There is no evidence to support such an inference. Furthermore, even if true, this fact would not create a conflict between Hughes and the

## D. Rule 23(a)(4): Adequacy

 Finally, the fourth requirement of Rule 23(a) is whether the proposed class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[A]dequacy of representation entails an inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to the conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Notwithstanding the concerns expressed below, the Court finds that Plaintiffs satisfy both requirements.

### 1. Named Plaintiffs

 As to the first requirement, named Plaintiffs Hughes and Hodjat seek to represent the class. Defendants first object to Hughes as a named plaintiff because he "is a long-time friend" of Brian Kreisler, one of the many attorneys purportedly serving as class counsel, but who has not entered his appearance in this case, but appears on many of Plaintiffs' filings. (Dkt. 82 at ECF 28.) Defendants, however, fail to put forward any concrete evidence suggesting that Plaintiff Hughes would not adequately protect the interests of absent class members because of his friendship with a lawyer associated with the putative class's counsel whose role in this litigation is unclear, at best.[17] *See Kumar v. Salov N. Am. Corp.*, 14-CV-2411, 2016 WL 3844334, at *3 (N.D. Cal. July 15, 2016) ("Any suggestion of a conflict here is undermined by the fact that [class counsel] is not a partner and is only one of several attorneys, from two firms, litigating the case."). Thus, the Court concludes that such a "hypothetical

absent class members (although it might be an issue at the merits stage). Even assuming that Hughes is assisting Kreisler in pursuing a campaign against NBTY, their interests are not antagonistic or contrary to the putative class members, who would also be pursuing claims against NBTY.

conflict of interest is too diaphanous to bar certification at [the class certification] stage." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309 (S.D.N.Y. 2004).[18]

Defendants also challenge named Plaintiff Hodjat's ability to serve as class representative. They contend that Hodjat is conflicted because she previously served as co-counsel in *Lowe v. Medtronic*, a product-liability action initially filed by Maurice Hudson, an attorney with proposed class counsel's firm, Reese Richman LLP, and Hodjat's own law firm. (Dkt. 82 at ECF 29-30.) Defendants argue that "the ongoing professional overlap" between Hodjat and Reese Richman "suggests that Hodjat may have agreed with Reese Richman to serve as a named plaintiff in this lawsuit in exchange for a role in the *Lowe* action" and "is *per se* a conflict of interest." (*Id.*)[19] Even accepting Defendants' inference as true, these previous (and potentially ongoing) business relationships do not necessarily disqualify Hodjat from serving as a named plaintiff because there is no evidence suggesting that this alleged business relationship makes Hodjat's interests antagonistic to those of absent class members. *See Macarz v. Transworld Sys., Inc.*, 193 F.R.D. 46, 52 (D. Conn. 2000) ("The Court will not decline class certification simply because the plaintiff and his counsel have had professional dealings in the past, without any other evidence suggesting some improper purpose for the suit.").

### 2. Class Counsel

■■■ As to the second requirement, Plaintiffs have submitted the resumes of proposed class counsel Reese Richman LLP and Whaley Kallas LLP. (Dkts. 96-11, 96-12.) There is no question that these two firms are not only qualified to conduct this litigation, but also have a history of success in consumer fraud class actions similar to the present case. *See Ackerman*, 2013 WL 7044866, at *22 (appointing Reese Richman as class counsel in case challenging alleged false and misleading representations with respect to "vitaminwater").

Defendants also seek to disqualify class counsel because Complex Litigation Group LLC, one of the firms appearing on the docket here has had supposed ethical issues and exhibited "irregularities." (Dkt. 82 at ECF 28.) Although Complex Litigation Group "was recently excoriated by the Seventh Circuit for 'scandalous' tactics and 'lack of integrity[ ],'" *id.* (quoting *Eubank*, 753 F.3d at 721, 724), it is not seeking appointment as co-lead class counsel, and the attorney at issue in *Eubank* has not even filed a notice of appearance in this case. (Dkt. 100 at ECF 14-15.) This argument thus appears to have little to do with Reese Richman LLP's and Whatley Kallas LLP's ability and qualifications to represent the class in light of their substantial experience, knowledge, and success in consumer fraud class actions.

Accordingly, Plaintiffs' have demonstrated that proposed class counsel is adequate under Rule 23(a)(4).

### E. Ascertainability

■■■ In addition to the express requirements of Rule 23(a), courts within the Second Circuit have consistently recognized the "implied requirement of ascertainability." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (quotations and citations omitted); *In re Initial Pub. Offerings*, 471

---

**18.** Defendants' citation to the Seventh Circuit's decision in *Eubank v. Pella Corporation*, 753 F.3d 718 (7th Cir. 2014) is inapposite. In *Eubank*, the Seventh Circuit deemed it improper for a class representative to be the son-in-law of lead class counsel. *Id.* at 722–24. This makes perfect sense. The son-in-law of class counsel will likely benefit from his father-in-law's receipt of attorneys' fees, thereby creating a disqualifying conflict because the son-in-law is likely to put his father-in-law's personal interests above those of the absentee class members, such as agreeing to a settlement which increases legal fees for his father-in-law. Comparable facts are not present here.

**19.** The authority cited by Defendants, *In re Discovery Zone Securities Litigation*, 169 F.R.D. 104, 109 (N.D. Ill. 1996), contains critical distinctions to the case here. Specifically, the court in *In re Discovery Zone Securities Litigation* concluded that the named plaintiffs had an inappropriate business relationship with class counsel because they were the personal stockbrokers for those attorneys. 169 F.R.D. at 109. The conflict in such a situation is evident: the higher the attorneys' fees, the more class counsel would likely invest with their stockbrokers, the named plaintiffs. Again, analogous facts are not present here.

F.3d at 30 (2d Cir. 2006); *Ruffo v. Adidas Am. Inc.*, 15 CIV. 5989, 2016 WL 4581344, at *2 (S.D.N.Y. Sept. 2, 2016) ("Plaintiffs have not satisfied the predominance or ascertainability requirements.").[20] "[T]he touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher*, 806 F.3d at 24 (citations and quotation marks omitted). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Huebner v. Midland Credit Mgmt., Inc.*, 14 CIV. 6046, 2016 WL 3172789, at *7 (E.D.N.Y. June 6, 2016) (citation and quotation marks omitted). "[T]he use of objective criteria cannot alone determine ascertainability when those criteria, taken together, do not establish the definite boundaries of a readily identifiable class." *Brecher*, 806 F.3d at 25.[21]

Within the Second Circuit, courts have repeatedly recognized the ascertainability requirement, but reached contrary results.[22] *Compare Scotts*, 304 F.R.D. at 407 (finding class of individuals who purchased seed/fertilizer packages containing the alleged misrepresentation was sufficiently ascertainable even though class members likely lacked proof of purchase), *Ebin*, 297 F.R.D. at 567

(finding a class of olive oil purchasers was ascertainable despite plaintiffs being unlikely to have retained receipts), *Ackerman*, 2013 WL 7044866, at *16 (class of vitaminwater purchasers ascertainable even though members "may be difficult to locate ... since most will not have kept receipts or other documentation of their purchases"), *with Avon*, 2015 WL 5730022, at *5 (class of purchasers of skin products not ascertainable where purchase records did not exist and "even if the proposed verification method effectively identified consumers who purchased the class products, [defendant's] records do not show whether putative class members saw the allegedly false statements."), *Weiner*, 2010 WL 3119452, at *12 (plaintiffs failed to satisfy the ascertainability requirement where the alleged misrepresentation, "All Natural," did not appear on every Snapple bottle that existed during the class period).

■ Here, Plaintiffs fail to satisfy the implied requirement of ascertainability because of the combination of two facts unique to this case. First, as Defendants maintain, "Plaintiffs offer no basis to find that putative class members will have retained a receipt, [the Products'] label, or any other concrete documentation of their purchases of [the Products] bearing ["The Better Vitamin C"] description." *Weiner*, 2010 WL 3119452.[23]

20. During oral argument on Defendants' motion to strike, Plaintiffs argued that there is a trend towards rejecting the implied requirement of ascertainability. In the Second Circuit, however, no such trend is evident.

21. There is authority in the Second Circuit suggesting that courts should hesitate before denying a class certification motion on ascertainability grounds alone. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001). The Second Circuit's more recent decision in *Brecher*, however, calls into question whether this is still good law, especially because the Second Circuit in *Brecher* favorably cited to *Weiner v. Snapple Beverage Corp.*, a Southern District of New York case, which as discussed further below, identifies the plaintiffs' failure to satisfy ascertainability as a "potentially serious impediment[] to class certification." 2010 WL 3119452, at *12.

22. Outside the Second Circuit, the Third Circuit has provided one of the most extensive discussions on ascertainability. *See Carrera v. Bayer*

*Corporation*, 727 F.3d 300 (3d Cir. 2013). In that case, the panel explained that "[a]scertainability provides due process by requiring that a defendant be able to test the reliability of the evidence submitted to prove class membership." *Id.* at 307. The *Carrera* court concluded that the plaintiffs had failed to demonstrate that a class of purchasers of WeightSmart—a product sold by the defendants—was ascertainable because (1) there was no evidence that a court could determine individual purchases based on retailer records and (2) affidavits were an insufficient method to accurately identify class members. *Id.* at 310–12. The Third Circuit then vacated the district court's order certifying the class action, but permitted plaintiffs to conduct limited discovery on the issue of ascertainability and another opportunity to satisfy the requirement. *Id.* at 312.

23. The Court acknowledges that *Weiner* was expressly rejected in *Ebin*, 297 F.R.D. at 567 ("Although *Snapple* is not binding on this Court, it raises concerns. ... [T]he Court finds that, in the end, *Snapple* goes further than this Court is prepared to go, and, indeed, would render class

Second, although "The Better Vitamin C" representation appeared on all of the Products, Defendants only *"licensed* the Ester-C intellectual property," as did "at least 150 other U.S. companies." (Dkt. 82 at ECF 14 (emphasis in original).) This means that over 150 companies, including Defendants, marketed and sold Ester-C products bearing "The Better Vitamin C" label. Thus, because putative class members would not be able to recall or perhaps even know whether they purchased the Products actually licensed by Defendants, as opposed to the myriad other Ester-C licensees, "soliciting declarations . . . regarding [class members'] history of [Ester-C] purchases would invite them to speculate, or worse." *Weiner,* 2010 WL 3119452; *see also In re Avon,* 2015 WL 5730022, at *5 (finding self-identification to be unreliable and creating great risk of false positives); *Jones,* 2014 WL 2702726, at *10 ("Even assuming that all proposed class members would be honest, it is hard to imagine that they would be able to remember which particular Hunt's products they purchased from 2008 to the present, and whether those products bore the challenged label statements.").[24] Simply put, the wide licensing of the Products "renders accurate self-identification infeasible," and thus Plaintiffs have not demonstrated that the class is ascertainable. *Ault v. J.M. Smucker Co.,* 310 F.R.D. 59, 66 (S.D.N.Y. 2015).

Accordingly, because Plaintiffs' putative class is not ascertainable, Plaintiffs fail to establish the prerequisites of a class action under Rule 23. Nonetheless, because some courts have declined to deny class certification on ascertainability grounds alone, the Court addresses the other requirements of Plaintiffs' proposed Rule 23(b)(3) and (b)(2) classes.

actions against producers almost impossible to bring."). However, the Court does not share the concern expressed in *Ebin,* that finding the class proposed here to be un-ascertainable would make consumer class actions impossible to bring. If Rule 23's implied ascertainability requirement is to have any meaning, then surely it applies in a case such as this, where there are no records of consumer purchases and it is impossible for consumers to accurately self-report.

**24.** Limiting the class to those putative members who purchased the Products manufactured by

## V. RULE 23(b)(3) REQUIREMENTS

As previously discussed, in addition to Rule 23(a)'s requirements, plaintiffs seeking certification of a damages class, must also satisfy Rule 23(b)(3), which requires a showing that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," *i.e.,* predominance, and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy[,]" *i.e.,* superiority. Fed. R. Civ. P. 23(b)(3).

### A. Predominance

■■■■■ "The court has a duty to take a close look at whether common questions predominate over individual ones." *Ackerman,* 2013 WL 7044866, at *18 (citation and quotation marks omitted). FRCP 23(b)(3)'s predominance requirement "imposes a 'far more demanding' inquiry into the common issues which serve as the basis for class certification." *Sykes,* 780 F.3d at 81 (quoting *Amchem,* 521 U.S. at 623–24, 117 S.Ct. 2231). "If anything, [it] is even more demanding than Rule 23(a)." *Comcast,* 133 S.Ct. at 1432 (citing *Amchem,* 521 U.S. 591, 623–24, 117 S.Ct. 2231.). "Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach,* 778 F.3d at 405 (citations omitted).[25]

Defendants argue that common questions do not predominate because (1) reliance or causation turn on individualized proof, and

Defendants does not address this problem because consumers would still be unable to self-identify as belonging to this narrower class.

**25.** "The purpose of the predominance inquiry is to ensure[ ] that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision[s] as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Avon,* 2015 WL 5730022, at *3 (citations and quotation marks omitted).

(2) Plaintiffs' proposed damages methodologies fail to demonstrate that damages can be calculated on a class-wide basis, as required by the Supreme Court's *Comcast* decision. (Dkt. 82 at ECF 12-18.)[26] The Court addresses each argument in turn.

### 1. Reliance and Causation

Defendants' first argument against predominance is that that even where, as here, there is a uniform misrepresentation, *i.e.*, the appearance of "The Better Vitamin C" on all Products, class certification still fails because Plaintiffs cannot establish the requisite class-wide reliance or causation. (Dkt. 82 at ECF 24-25.) Plaintiffs respond that reliance and causation are not a barrier to class certification here because neither element "turn[s] on individualized proof." (Dkt. 100 at ECF 11.) They argue that "[u]nder the relevant statutes, reliance is not required or can be presumed based on the materiality of the statement." (*Id.*) In essence, Plaintiffs contend that because "The Better Vitamin C" is a "material" representation, no individualized determinations are required, and common issues predominate. However, whether reliance and causation can be shown on a class-wide basis depends on the applicable State law. The Court, therefore, addresses each proposed sub-class individually.

### a) California Sub-Class

As previously discussed, the proposed California sub-class, represented by Plaintiff Hughes, asserts claims under California law, specifically, the UCL, FAL, and CLRA. These statutes all permit relief absent individualized proof of reliance where a representation is material. *Kumar*, 2016 WL 3844334, at *7-8 (under California's consumer protection statutes, "[p]roof that statements were material to the plaintiff purchaser class, and that class members relied on those statements in making purchasing decisions, does not necessarily require individualized evidence for each class member." (citation omitted)); *Ackerman*, 2013 WL 7044866, at *19 (because "UCL, FAL, and CLRA use an objective, reasonable consumer standard

for reliance, those claims present liability questions that are capable of class-wide resolution using class-wide evidence, and will generate common answers.").

"Materiality 'is a question common to all members of the class' when, as here, the materiality of an alleged misrepresentation is judged according to an objective standard." *In re Scotts*, 304 F.R.D. at 410 (quoting *Amgen*, 133 S.Ct. at 1191)). As one court aptly put it: "The objective test for materiality and thus reliance 'renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product.'" *Id.* (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012)). Accordingly, individualized issues of reliance or causation do not defeat the California sub-class Plaintiffs seek to certify.

### b) Missouri Sub-Class

For similar reasons, Plaintiffs' Missouri sub-class satisfies Rule 23's predominance requirement. On behalf of the putative Missouri sub-class, Plaintiff Hodjat asserts a claim under the MMPA, which prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise[.]" Mo. Rev. Stat. S 407.020. Similar to how courts have analyzed the California statutes, courts have also certified classes under the MMPA, specifically rejecting the argument, which Defendants make here, that the MMPA requires individual proof of causation. *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 68 (D.N.H. 2015) (finding "that the plaintiffs' MMPA claim is capable of classwide proof" because individual proof of causation is not required). Accordingly, individualized issues of reliance or causation do not defeat Plaintiffs' proposed Missouri sub-class.

**26.** As previously discussed, there is much overlap between Defendants' Rule 23(a) commonality and Rule 23(b)(3) predominance arguments. The Court addressed some of Defendants' predominance arguments in the commonality section above, based on the Court's determination that these arguments were better addressed in the context of that requirement.

#### c) Nationwide Class

 Plaintiffs' nationwide class, which is brought under New York common law for negligent misrepresentation and unjust enrichment, is more problematic.[27] "When claims in a class action arise under state law—and the class comprises multiple states—the court must consider whether different state laws will apply to different members of the class." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 140 (2d Cir 2015). "Courts must exercise care in conducting a choice-of-law analysis in a putative Rule 23(b)(3) class action ... in order to determine whether any conflicts in governing law will overwhelm the ability of the trier of fact meaningfully to advance the litigation through class[-]wide proof." *Id.* at 141. A "single difference" in the State laws governing plaintiffs' claims is not necessarily a substantial difference, and so is not fatal to the plaintiff's ability to demonstrate predominance of common questions over individual ones. *Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125, 140 (S.D.N.Y. 2014).

"A federal district court sitting in diversity generally applies the choice of law rules of the state in which it sits." *In re Frito–Lay N. Am., Inc. All Nat. Litig.*, 12 MD 2413, 2013 WL 4647512, at *19 (E.D.N.Y. Aug. 29, 2013). "Under New York choice of law principles, claims sounding in fraud ... are governed by the law of the state in which the injury is deemed to have occurred, which is usually where the plaintiff is located." *Id.* at *19 (quotations and citations omitted).[28] Here, it appears that the purported nationwide class consists of members from all fifty States and because the injury alleged—a false representation—would occur in the State in which the consumer purchased the product, plaintiffs' common law allegations implicate the laws of all fifty States. *See In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 149 (S.D.N.Y. 2008) (applying law of State of purchase for fraud claims); *see also Rodriguez*, 300 F.R.D. at 142 ("The law applicable to [the] claims is the state unjust enrichment law of the jurisdiction where [defendants] allegedly made material misrepresentations to each prospective class member."). Thus, it is necessary for the Court to determine whether are there are such variations in the laws of the fifty states as to render Plaintiffs' claims incapable of classwide resolution due to the lack of predominance.

 *Negligent Misrepresentation.* Turning to Plaintiffs' claim for negligent misrepresentation, the Court finds that there are sufficiently significant variations between the laws of the fifty states to defeat Rule 23(b)(3)'s predominance requirement. The most obvious variation—which, in itself, is enough to deny class certification—is that not every State recognizes the tort of negligent misrepresentation, and some states only recognize it under certain circumstances. For example, as Plaintiffs concede, Arkansas and Idaho do not recognize negligent misrepresentation. (Dkt. 103 at ECF 16.) Virginia also "does not recognize a general cause of action for negligent misrepresentation," except as "an action for constructive fraud." (Dkt. 103–3 at ECF 11 (citing *Zaklit v. Global Linguist Solutions, LLC*, 1:14CV314, 2014 WL 3109804, at *19 (E.D. Va. July 8, 2014) and *Smith v. Flagstar Bank*, 3:14-CV-741, 2015 WL 1221270, at *5 (E.D. Va. Mar. 17, 2015)).) And Indiana only recognizes a cause of action for negligent representation "in the limited context of an employer-employee relationship." *Bledsoe v. Capital One Auto Fin.*, 1:14–CV–02109, 2016 WL 1270206, at *8 (S.D. Ind. Mar. 31, 2016). Thus, courts have declined to certify nationwide classes based on negligent misrepresentation because the laws of fifty states have "material" differences, which could "mean the difference between success and failure" of a plaintiff's claims. *See, e.g., Gianino v. Alacer Corp.*, 846 F.Supp.2d 1096, 1102 (C.D. Cal. 2012).

---

27. As previously noted, when Plaintiffs originally filed their class certification motion, they also sought to certify a nationwide class for common law fraud, which they have since withdrawn. (Dkt. 139.)

28. Notwithstanding the dismissal of Plaintiffs' common-law fraud claim, Plaintiffs' negligent misrepresentation and unjust enrichment claims still "sound in tort pursuant to New York law." *Rodriguez*, 300 F.R.D. 125 at 135.

■ *Unjust Enrichment.* Such variations also exist with respect to Plaintiffs' unjust enrichment claims. Indeed, "courts have determined that the states' unjust-enrichment laws vary in relevant respects." *Grand Theft*, 251 F.R.D. at 147 (collecting cases); *Kottler v. Deutsche Bank AG*, 08 CIV. 7773, 2010 WL 1221809, at *4 (S.D.N.Y. Mar. 29, 2010) ("[V]ariations in state law have generally precluded nationwide class certifications based on unjust enrichment theories."); *Keilholtz v. Lennox Hearth Prod. Inc.*, 268 F.R.D. 330, 341 (N.D. Cal. 2010) ("Laws concerning unjust enrichment do vary from state to state."). Without explanation, Plaintiffs indiscriminately cite cases finding that the unjust enrichment laws in relevant States do not vary. But this selective and incomplete citation of cases is insufficient to meet their burden. By contrast, Defendants identify multiple variations in State laws regarding unjust enrichment. As just one example, the States differ as to the relationship or connection that must exist between the parties for an unjust enrichment claim. *See Vista Healthplan, Inc. v. Cephalon, Inc.*, 2:06-CV-1833, 2015 WL 3623005, at *29 (E.D. Pa. June 10, 2015) (explaining differences between various State laws including New York's unique requirement that a "relationship or connection between the parties that is not too attenuated" must be shown).[29]

This variation alone is enough to defeat certification. Thus, "plaintiffs have not met their burden of establishing the predominance of common issues over individual issues relevant to the unjust enrichment claims of the proposed national class." *Rodriguez*, 300 F.R.D. at 143.

### 2. Damages

■ Plaintiffs' putative classes also fail Rule 23(b)(3)'s predominance requirement because they fail to present a damages methodology that measures damages on a class-wide basis. To satisfy this requirement, Plaintiffs must present a damages methodology that is "consistent with [their] liability case." *Comcast*, 133 S.Ct. at 1432. As the Second Circuit recently articulated, "*Comcast* held that a model for determining class[-]wide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Roach*, 778 F.3d at 407. However, "[t]he Supreme Court did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving

**29.** Because the Court finds that variations in State law regarding negligent misrepresentation and unjust enrichment claims defeat Plaintiffs' nationwide class, it need not address whether individualized determinations would be necessary as to the elements of these claims here. On this issue, however, the Court notes that, in *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008), a case involving an alleged misrepresentation in the Racketeer Influenced and Corrupt Organizations Act (RICO) context, the Second Circuit suggested that reliance or causation might be necessary for class certification on a fraud or negligent misrepresentation claim. In *McLaughlin*, the Second Circuit held that even where there exists a uniform misrepresentation, for purposes of establishing predominance, class plaintiffs must still show that the element of reliance is amenable to "general proof." 522 F.3d at 223. The plaintiffs in *McLaughlin* brought claims for fraud under RICO, 18 U.S.C. §§ 1961–1968, based on the defendant cigarette company's alleged misrepresentation that its cigarettes were "light," thereby suggesting that they were healthier than full-flavored cigarettes. *Id.* at 219–220. The Second Circuit reversed the district court's certification of the class, finding that the lower court had erred in its Rule 23(b)(3) predominance determination. *Id.* at 222. As the Second Circuit explained, "to prevail in their argument for class certification, plaintiffs [needed to] establish that the issues of injury and causation [did] not defeat the predominance requirement of Rule 23(b)(3)." *Id.* Focusing on reliance, the Second Circuit expressly held that "proof of misrepresentation—even widespread and uniform misrepresentation—only satisfies half of the equation; the other half, reliance on the misrepresentation, cannot be the subject of general proof. Individualized proof is needed to overcome the possibility that a member of the purported class purchased [light cigarettes] for some reason other than the belief that [light cigarettes] were a healthier alternative." *Id.* at 223. The Second Circuit reasoned that because "the market for consumer goods ... is anything but efficient," a presumption of class-wide reliance was inappropriate. *Id.* at 224.

Although the Second Circuit in *McLaughlin* did not analyze any of the claims at issue here and appears to have a scant following in the context of consumer fraud litigation based on such claims, *McLaughlin* would appear to be applicable to a case such as this one. However, given the Court's decision not to certify the class based on ascertainability and the absence of a valid classwide damages model, the Court need not resolve this issue.

individualized damages calculations." *Id.* at 408.

The predominance inquiry here warrants an in-depth review of the Supreme Court's seminal decision in *Comcast Corporation v. Behrend.* In that case, a putative class of more than two million current and former Comcast subscribers in the Philadelphia area sought damages for alleged "unlawful swap agreements" that allegedly violated federal antitrust laws. 133 S.Ct. at 1430. The *Comcast* plaintiffs contended that the defendants had "acquir[ed] competitor cable providers in [the Philadelphia region] and swap[ped] their own systems outside the region for competitor systems located in [the Philadelphia region]." *Id.*[30] By doing this, Comcast allegedly increased its "share of subscribers in the region ... from 23.9 percent in 1998 to 69.5 percent in 2007." *Id.* The putative class members asserted that this attempted monopoly "eliminat[ed] competition and [held] prices for cable services above competitive levels [in the Philadelphia region]." *Id.*

The *Comcast* plaintiffs asserted that Comcast's alleged conduct increased its bargaining power, which in turn "increased cable subscription rates" throughout the Philadelphia region. *Id.* Plaintiffs' expert provided the district court with a regression model, which "compar[ed] actual cable prices" in the Philadelphia region "with hypothetical prices that would have prevailed but for [Comcast's] allegedly anticompetitive activities." *Id.* at 1431. The court certified the class, accepting plaintiffs' "overbuilding theory ... as capable of class[-]wide proof" for purposes of Rule 23's predominance inquiry. *Id.* The Third Circuit affirmed. *Id.*

The Supreme Court disagreed and reversed. Starting from the premise "that a model purporting to serve as evidence of damages ... must measure only those damages attributable" to the plaintiffs' proffered theory, the Court concluded that "[t]here [was] no question that [plaintiffs' proposed model] failed to measure damages resulting from the particular antitrust injury on which [the class's] liability ... [was] premised." *Id.*

at 1433. Rather, based on the expert's admission, the Court found the plaintiffs' damages model measured "anticompetitive conduct as a whole and did not attribute damages to any one particular theory of anticompetitive impact." *Id.* at 1434. Because of this, the methodology failed to account for the fact that class members in different regions might have paid elevated prices for different reasons. *Id.* Thus, the Supreme Court concluded, "[t]he permutations involving four theories of liability and 2 million subscribers located in 16 counties are nearly endless." *Id.* at 1434–35.

■ The reasoning in *Comcast* dictates the same result here. Plaintiffs are seeking damages based on a price premium theory, *i.e.*, had they known that "The Better Vitamin C" statement made by Defendants on their Products was false they "would not have purchased Ester-C or paid the premium price (of approximately 300%) for the Ester-C [they] bought." (Dkt. 13 ¶¶ 9, 10.) Based on these allegations, "[d]amages are measured by the difference between what the plaintiff paid and the value of what the plaintiff received. *Scotts*, 304 F.R.D. at 412. In keeping with *Comcast*, "Plaintiffs must therefore propose damages models that take into account the value of the product [P]laintiffs received, and the amount they paid for" Ester-C. *Scotts*, 304 F.R.D. at 412–13.

After initially failing to put forth any model for calculating damages (Dkt. 95), Plaintiffs retained Weir to "determine whether it would be possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of damages suffered by, and/or restitution owed to, the proposed class of plaintiffs as a result of the allegedly false and misleading Claim[,]" which Weir defined as "The Better Vitamin C" representation. (Dkt. 109–1 at ECF 6.)

The Court heard testimony from Weir at the *Daubert* hearing on September 20, 2016. As in his expert report, Weir testified that there were multiple models for calculating

---

**30.** For example, Comcast "obtained Adelphia Communications' cable systems in the [Philadelphia region]" and "in exchange, [Comcast] sold to Adelphia their systems in Palm Beach, Florida, and Los Angeles, California." *Id.*

damages that could be applied, either alone or in combination, in this action, including: (1) full refund; (2) restitutionary disgorgement; (3) hedonic regression; (4) conjoint analysis; and (5) contingent valuation analysis. When pressed on which theory he thought best fit Plaintiffs' theory of the case, Weir identified restitutionary disgorgement and hedonic regression, the latter to be used in combination with conjoint and contingent analyses, in order to screen out the price premium resulting from attributes other than "The Better Vitamin C" label, *e.g.*, claims about better absorption or 24-hour immune support.[31]

The Court, however, finds that none of the proposed models succeeds in measuring damages on a class-wide basis. While all three of Weir's price premium methodologies can determine the alleged premium of the Products as a whole, none can isolate the premium attributable to Plaintiffs' theory of the case, namely, that consumers paid more for the Products due to the representation "The Better Vitamin C." The reason is simple: "better" is not an objective term that carries a single definition or refers to a specific product feature.[32] Weir acknowledged as much in his deposition:

> Q: I asked you before how you interpret or might interpret the term 'better' if, if you encountered it on a toaster. How would

you interpret it if you encountered it on a vitamin C product? Personally.

A: Just that the product is *somehow superior* to others.

(Dkt. 109–1 at ECF 154 (emphasis added).)

Thus, because the term "better" has no meaning on its own, in order to measure the damages attributable to "The Better Vitamin C," it is necessary to look at this representation in the context in which it appears. During the putative class period, the representation appeared alongside various rotating representations, including, but not limited to:

- "Enhanced Absorption With C-Sorb"
- "Non-Acidic"
- "Stomach Friendly"
- "Patented Formula"
- "24 Hour Immune Protection"
- "15% More Free"
- "24 Hour Immune System Health Support"
- "Antioxidant Support"
- "Patented Vitamin C Formula"
- "Enhanced Absorption"
- "#1 Pharmacist Recommended Brand"
- "Antioxidant Health"
- "24 Hour Immune Support"

**31.** The Court flatly rejects two of Weir's proposed methodologies: (1) full refund and (2) restitutionary disgorgement. First, although Plaintiffs' expert insists that a full refund restores a consumer to their "pre-transaction level of prosperity" (Dkt. 109 at ECF 23), common sense suggests otherwise. A full refund model "rests on the assumption that [P]laintiffs received no benefit whatsoever from purchasing" Ester-C. *Scotts*, 304 F.R.D. at 412. Here, however, Plaintiffs do not allege that they received a valueless product, which renders the full refund model a poor fit for their damages theory. Second, Weir proposes two "disgorgement" methodologies. "Under the first method, Defendants would be required to disgorge the totality of the wholesale revenues derived from the sale of the Products" and "[u]nder the second method, Defendants would be required to disgorge the revenues, less cost of goods sold, from the sale of the Products." (Dkt. 109–1 at ECF 24.) Both versions of the disgorgement model, which would either or both deprive Defendants of all profits or inflict a penalty of lost costs, are contrary to Plaintiffs' legal theory,

*i.e.*, that they paid more for Ester-C than they would have for another vitamin C product. Thus, as with the full refund method, "the disgorgement model does not comport with *Comcast*'s requirement that class-wide damages match plaintiffs' legal theories," *see Scotts EZ*, 304 F.R.D. at 413, and fails too.

**32.** The lack of an objective meaning of "better" distinguishes this case from others where the representations had a discernable meaning. *See, e.g., Belfiore*, 311 F.R.D. 29 (alleging false labeling of wipes as "flushable"); *Scotts*, 304 F.R.D. 397 (alleging misleading "50% thicker" claim on fertilizer product); *Ebin*, 297 F.R.D. 561 (alleging fraud and negligent misrepresentation based on "100% Pure Olive Oil" claim). Notably, neither party here has identified a comparable case where a court has certified a class action based on a representation such as "better." Moreover, the Court finds it telling that, when asked at the *Daubert* hearing whether he could identify a representation that would be too subjective for calculating damages, Weir demurred.

The problem with Weir's methodologies is obvious: it fails to account for the fact that "The Better Vitamin C" conceivably encapsulates some, if not all, of these terms, such that any damages methodology failing to isolate "The Better Vitamin C" from these other representations results in an overvaluing of the price premium attributable to the alleged misrepresentation. In the alternative, isolation of the representation "The Better Vitamin C" renders it meaningless because consumers naturally will interpret "better" differently based on the surrounding context. The only solution is to determine damages based on each class members' precise definition of "better," a result plainly prohibited by *Comcast.* In this scenario, "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class," and therefore not predominate. *Comcast,* 133 S.Ct. at 1433.

*ConAgra Foods,* a case in which Weir was also retained by Plaintiffs' counsel to serve as a damages expert, demonstrates the precise reasons a class *cannot* be certified here. There, the Court found that Weir "fail[ed] to provide an acceptable damages methodology that isolate[d] and quantifie[d] damages associated with plaintiffs' specific theory of liability—that they were misled to believe that Wesson Oils contained no GMOs or GMO ingredients because of the '100% Natural' label." 90 F.Supp.3d at 1024. The Court only certified the class because another expert proposed a conjoint analysis that, when combined with Weir's hedonic regression, could "produce a damage figure attributable *solely to ConAgra's alleged misconduct.*" *Id.* at 1025 (emphasis in original). As previously discussed, during the *Daubert* hearing, Weir suggested utilizing a similar hedonic regression and conjoint analysis combination to determine damages in this case. But such a model does not work with Plaintiffs' theory of the case—that Ester-C is somehow "bet-

ter" than some unidentifiable comparator.[33] Indeed, Plaintiffs have not demonstrated that, under this theory, *any* damages model would adequately quantify the price premium attributable to a word as amorphous as "better."[34]

Accordingly, Plaintiffs have not demonstrated that damages are calculable on a class-wide basis and therefore individualized questions of fact or law predominate over common questions and Rule 23(b)(3)'s predominance requirement is not satisfied.

**B. Superiority**

■ In addition to satisfying predominance, Plaintiffs must also demonstrate that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Among the relevant factors a Court considers for a finding of superiority are: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." *Id.*; *see also United States v. City of New York,* 276 F.R.D. 22, 29–30 (E.D.N.Y. 2011).

Here, Defendants do not appear to argue that Plaintiffs fail to satisfy this element. Indeed, because the Court concludes that Plaintiffs' putative class fails to satisfy requirements under Rules 23(a), (b)(2), and (b)(3), it need not even address whether Plaintiffs have demonstrated superiority. Nonetheless, aside from the manageability concerns addressed in the Court's ascertainability analysis, the Courts finds that the su-

**33.** Weir testified that for purposes of his hedonic regression analysis in this case, the comparators would be a vitamin C product that did not claim to be "better." However, this "binary" approach elides the fact that the absence of a singular or common understanding of "better" makes it impossible to determine the actual value attributable to "better," and thus makes such a binary comparison, *i.e.,* Ester-C versus products without

a "better" claim, meaningless from a damages perspective.

**34.** The Court recognizes that Weir's methodologies have been accepted in other similar cases. The "better" representation, however, is unique and separates this case from others that have found *Comcast* satisfies based on his methodologies.

periority factors weigh in favor of class certification. "In a consumer class action of this type involving the purchase of a relatively inexpensive [product], injured consumers are extremely unlikely to pursue their claims on an individual basis." *Johnson v. Gen. Mills, Inc.*, 275 F.R.D. 282, 289 (C.D. Cal. 2011).

## VI. RULE 23(b)(2) REQUIREMENTS

Lastly, Plaintiffs seek certification of injunctive classes under Rule 23(b)(2), which permits an injunctive class where "the party opposing the class has acted or refused to act on grounds that apply generally to the class[.]" Fed. R. Civ. P. 23(b)(2). Plaintiffs contend that "class certification under Rule 23(b)(2) is particularly appropriate here since individual damages are small and are not the motivating factor behind this litigation." (Dkt. 95 at ECF 18.) There are two issues, however, which prevent the Court from certifying a Rule 23(b)(2) injunctive class: (1) the named Plaintiffs lack standing to seek such injunctive relief, and (2) the record demonstrates that there is no risk of future harm because the allegedly misleading label has been removed from the Products.

▮ First, Defendants assert that Plaintiffs lack standing to seek injunctive relief. (Dkt. 82 at ECF 24-25.) Here, Plaintiffs Hughes and Hodjat both allege that, if they had been aware of the alleged truth of the Products, they would not have bought them. (Dkt. 13 at ¶¶ 9, 10.) Thus, because they are now aware of the alleged misrepresentation, they are "unlikely to buy the [Products] again" and "[a]ccordingly, they lack standing to seek a forward-looking injunction." *Avon*, 2015 WL 5730022, at *8. Rather than dispute this incontrovertible fact, Plaintiffs argue that, as a matter of law, "mere knowledge of a deception" does not "defeat[ ] standing for injunctive relief." (Dkt. 100 at ECF 19.) Courts within the Second Circuit, however, have recently rejected Plaintiffs' argument. *Avon*, 2015 WL 5730022, at *8 ("Article III does not permit [a] public policy exception" and therefore plaintiffs do not have standing to pursue injunctive relief if they do not

intend to purchase products in the future); *Elkind v. Revlon Consumer Prods. Corp.*, 14-CV-2484, 2015 WL 2344134, at *3 (E.D.N.Y. May 14, 2015) ("[B]ecause the Amended Complaint fails to establish any likelihood of future or continuing harm, injunctive relief is inappropriate here."); *Tomasino v. Estee Lauder Cos.*, 44 F.Supp.3d 251, 255-56 (S.D.N.Y. 2014) ("While [the named plaintiff] suggests that she remains a potential Estee Lauder customer and is likely to be misled again ... she has not alleged a sufficient future injury to establish standing to assert her claims for injunctive relief because she has demonstrated she is, in fact, unlikely to purchase [the products at issue] again."); *but see Belfiore*, 311 F.R.D. at 67 (staying its decision on class certification, but noting that it "would give favorable consideration to certifying a 23(b)(2) injunctive class because "[p]ublic policy, as well as precedent, supports" finding that plaintiffs have standing notwithstanding lack of evidence that they plan to purchase products again). The Court finds persuasive those cases holding that plaintiffs lack Article III standing to pursue an injunctive class absent evidence of future concrete future harm, and therefore finds that Plaintiffs fail to demonstrate standing here.

▮ Second, Plaintiffs' 23(b)(2) injunctive class cannot be certified because "Plaintiff has not demonstrated that such relief is necessary." *Ault*, 310 F.R.D. at 68. Defendants removed the challenged slogan "from Ester-C packaging in early 2015."[35] (Dkt. 112 at ECF 30.) Thus, Plaintiff cannot establish that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *Ault*, 310 F.R.D. at 68 (finding injunctive relief unnecessary where defendant had removed the challenged label and had no intention of introducing the slogan in the future).

---

**35.** The parties do not directly address this issue in their papers, but Defendants cited the fact that they removed the alleged misrepresentation from

their Products in 2015 in their papers, and Plaintiffs do not appear to contest this fact. (Dkt. 112 at ECF 30.)

## CONCLUSION

For the foregoing reasons, both Defendants' motion to strike Plaintiffs' expert and Plaintiffs' motion for class certification pursuant to Rule 23 is denied. Because the Court finds that there are no additional facts that would cure the deficiencies in Plaintiffs' certification motion, the denial of that motion is with prejudice.[36]

SO ORDERED.

---

**36.** With respect to this finding, the Court notes that after Plaintiffs submitted their original certification motion briefing, the Court permitted supplemental briefing regarding the variations in Plaintiffs' State common-law claims and the calculation of class-wide damages. Indeed, over Defendants' objection, the Court allowed Plaintiffs additional time to retain an expert, which they had not done in anticipation of their certification motion, for purposes of proposing a damages methodology to be used in the predominance analysis. Thus, certification motion considered by the Court is, in essence, Plaintiffs' second attempt at certifying their class.